953 So.2d 1133 (2007)
In the Matter of the ADOPTION OF J.D.S.
No. 2005-CP-02021-COA.
Court of Appeals of Mississippi.
April 10, 2007.
*1134 William Paul Starks, II, Starkville, attorney for appellants.
Appellee, pro se.
Before KING, C.J., CHANDLER and ISHEE, JJ.
KING, C.J., for the Court.
¶ 1. Appellants G.G.S. and J.A.S, the former adoptive mother and her husband, appeal the chancellor's decision denying Appellants' petition to vacate the adoption of J.D.S. by B.P.P. Because this Court finds that Appellant J.A.S was not given notice of the adoption as required by Mississippi Code Annotated Section 93-17-3 (Rev.2004), the adoption by B.P.P. is void.

FACTS AND PROCEDURAL HISTORY
¶ 2. J.D.S. was born in August 1999. Appellant G.G.S. is J.D.S.'s maternal grandmother. In February 2000, G.G.S., a single woman, petitioned for, and was granted, an interlocutory decree of adoption in the chancery court of Rankin County, Mississippi.[1] In the six-month period following the grant of the interlocutory decree, but before the entry of the final decree, G.G.S married J.A.S. At the final hearing on the adoption, the chancellor questioned J.A.S. regarding his intentions toward the child if G.G.S. did adopt J.D.S. The chancellor granted the final decree of adoption to G.G.S. on August 25, 2000. J.A.S. was never added as a party to the *1135 adoption, nor was he included in the final decree.
¶ 3. J.D.S. lived with G.G.S. and J.A.S. until November 2003. In 2003, G.G.S. suffered two heart attacks and a nervous breakdown. At the time, two of J.D.S.'s half-siblings also lived in the home with G.G.S. and J.A.S. It is not clear from the record whether these half-siblings also were adopted.
¶ 4. G.G.S. testified that due to the strain of her recovery, she and J.A.S. were unable to care for J.D.S. appropriately. In October 2003, G.G.S. contacted B.P.P., a distant relative by marriage, and asked if B.P.P. would care for J.D.S. while G.G.S. focused on her recovery. G.G.S. contacted B.P.P. because B.P.P. had taken care of J.D.S. for a period of approximately four months when J.D.S. was sixteen months old. B.P.P. testified that she would only agree to care for J.D.S. if G.G.S. would allow her to adopt him. B.P.P. testified that she wished to adopt J.D.S. because she did not want G.G.S. to be able to "snatch" him away from her.
¶ 5. In November 2003, G.G.S. agreed to let B.P.P. adopt J.D.S.G.G.S. traveled to Starkville, Mississippi, with her son to meet B.P.P.B.P.P. picked up G.G.S. and drove her to the office of attorney Stephanie Mallette. Mallette, who represented B.P.P., had drawn up an agreed petition for adoption. G.G.S. read the petition and signed it. Several days later, G.G.S. relinquished physical custody of J.D.S. to B.P.P.
¶ 6. Mallette did not file the agreed petition with the Webster County Chancery Court until April 1, 2004. Between the time B.P.P. took custody of J.D.S. and the filing date, B.P.P. had re-married, but her new husband did not join the adoption petition. In May 2004, the chancellor entered a final decree of adoption, in which B.P.P. adopted J.D.S. Despite the entry of the final adoption decree, G.G.S. and J.A.S. continued to see J.D.S. occasionally until August of 2004 when B.P.P. refused to allow G.G.S. and J.A.S. to take J.D.S. on vacation to Disney World.
¶ 7. Until that time, J.A.S. did not know about the adoption. He testified that he believed that B.P.P. was keeping J.D.S. temporarily so that his wife could recover from her heart attacks more quickly. J.A.S. further testified that he approved of this arrangement because between his full-time job and taking care of G.G.S., caring for J.D.S. had become a difficult task. When J.A.S. learned of the adoption, he promptly began trying to have the adoption decree set aside. In May 2005, G.G.S. and J.A.S. filed their petition to vacate B.P.P.'s adoption of J.D.S.
¶ 8. On September 19, 2005, the same chancellor who granted B.P.P.'s adoption decree held a hearing on the petition to vacate the adoption. Both G.G.S. and J.A.S. testified at that hearing. G.G.S. testified that she did not understand that she would be terminating her parental rights by signing the agreed petition because the petition itself did not contain any language to that effect. J.A.S. testified that he had no knowledge of the adoption and that he believed that he was J.D.S.'s adoptive father. He stated that during the hearing on G.G.S.'s adoption petition, the chancellor questioned him extensively about his job, his plans to care for J.D.S. and his feelings about the adoption. B.P.P. testified that G.G.S. was aware of the ramifications of signing the adoption decree and that she actually pushed for the adoption to be finalized. Further, B.P.P. testified that G.G.S. told her that J.A.S. did not need to be involved in signing the petition and produced J.D.S.'s birth certificate, which did not list J.A.S. as the father.
*1136 ¶ 9. The chancellor denied the petition to vacate the adoption. When counsel for G.G.S. and J.A.S. argued that J.A.S. should have been a party to the adoption because he was a physical custodian of the child under Mississippi Code Annotated Section 93-17-5(1), the judge dismissed the argument. G.G.S. and J.A.S. timely appealed the chancellor's ruling.
¶ 10. On appeal, G.G.S. and J.A.S. raise the following issues:
(1) The chancellor lacked jurisdiction to enter the final decree granting B.P.P.'s petition to adopt J.D.S. because J.A.S. was not a party to the adoption.
(2) G.G.S. signed the second adoption petition under duress. Alternatively, her signature was involuntary, as she lacked the knowledge that she was terminating her parental rights by signing the petition.
(3) The chancellor erred by failing to require a six-month waiting period described in Mississippi Code Annotated Section 93-17-13 or employing other statutory safeguards, such as a home study before granting B.P.P.'s adoption petition.

STANDARD OF REVIEW
¶ 11. The question of subject matter jurisdiction is an issue of law to which this Court must apply a de novo standard of review. See Trustmark Nat'l Bank v. Johnson, 865 So.2d 1148, 1150(¶ 8) (Miss.2004); American Cable Corp. v. Trilogy Communications, Inc., 754 So.2d 545, 549(¶ 7) (Miss.Ct.App.2000). Additionally, the question of standing is a question to which this Court applies a de novo standard of review. See Department of Human Svcs. v. Gaddis, 730 So.2d 1116(¶ 4) (Miss.1998). Standing is also an issue which this Court may rule on sua sponte, whether it was raised in the lower court or not. See Benedict v. City of Hattiesburg, 693 So.2d 377, 381 (Miss.1997).

ANALYSIS
¶ 12. Because this Court holds that the chancellor lacked jurisdiction to grant B.P.P.'s adoption petition, the judgment of the chancellor is reversed and rendered.
1. Subject Matter Jurisdiction
¶ 13. With regard to the issue of subject matter jurisdiction, appellants argue that J.A.S. was a necessary party to the adoption under one of three theories: (1) he was the presumptive father, (2) he served in loco parentis, or (3) he was a physical custodian of the child as set forth in Mississippi Code Annotated Section 93-17-5(1). Appellants argue that because J.A.S. was a necessary party and because he did not receive notice of the adoption, the chancellor did not have subject matter jurisdiction to hear the case.
¶ 14. Mississippi Code Annotated Section 93-17-5(1) (Rev.2004) states in pertinent part as follows:
[T]here shall be made parties to any proceeding to adopt a child, either by process or by the filing of a consent to the adoption proposed in the petition, the following:
(i) Those persons having physical custody of such child, except persons having such child as foster parents as a result of placement with them by the Department of Human Services of the State of Mississippi. . . .
Miss.Code Ann. § 93-17-5(1)(i). The record clearly proves that the child, J.D.S., resided with J.A.S. and that J.A.S., acting as a step-parent, shared physical custody of the child with his wife, G.G.S.J.A.S. testified that he and J.D.S. were constantly together and that he was responsible for the day-to-day care of J.D.S. up until the *1137 time that G.G.S. took him to live with B.P.P.
¶ 15. The record also reflects that J.D.S. was still living in the home with G.G.S. and J.A.S. at the time that G.G.S. signed the adoption petition consenting to the adoption and that J.D.S. was not removed from their physical custody until after the adoption process had begun. As a physical custodian of J.D.S. at the time G.G.S. signed the adoption petition, J.A.S. was a necessary party to the adoption and was required, under the statute, to be included as a party either by consent or by process. The five-month delay between the signing of the petition and the filing of the petition, during which time J.D.S. began to reside with B.P.P., should not operate to remove J.A.S. from the list of necessary parties to the adoption, particularly as G.G.S. and B.P.P. had already begun the adoption process without J.A.S.'s notice at the time J.D.S. left G.G.S. and J.A.S.'s home. To hold otherwise would permit one physical custodian or parent to collude with the potential adoptive parent(s) to circumvent a physical custodian's right to notice under the statute.
¶ 16. Accordingly, this Court agrees with J.A.S.'s argument that, as a physical custodian, he was a necessary party to the adoption. J.A.S. clearly did not consent to the adoption; therefore, B.P.P. was required to join J.A.S. as a party through service of process. Her failure to do so renders the adoption void.
2. J.A.S.'s Legal Status as an Adoptive Parent
¶ 17. Although the original adoption proceeding is not before this Court, that proceeding directly impacts the Court's analysis in this case on the issue of notice. This Court finds merit in J.A.S.'s argument that he should have been treated as a necessary party with regard to B.P.P.'s adoption petition because J.A.S. was a legal parent as a result of the original adoption proceeding. Appellants' brief argues that J.A.S. was "a de facto party to the proceedings as he participated by testifying before the chancellor regarding his desire to be a parent to this child and the use of his surname in the final decree."
¶ 18. This Court agrees that the facts of this case are somewhat unusual, in that G.G.S. was a single adult when she petitioned for the adoption of J.D.S. in 2000. Between the time that the chancellor entered the interlocutory decree and the date of the hearing on the final decree, G.G.S. married J.A.S. Despite the marriage, G.G.S.'s attorney did not amend the petition to include J.A.S., although according to the adoption statutes, he should have done so.
¶ 19. Under Mississippi Code Annotated Section 93-17-3(4) (Supp.2006), the following persons have standing to adopt: (1) an unmarried adult or (2) a married person whose spouse joins the petition. Where the spouse of a married person fails to join a petition for adoption, the married person seeking the adoption loses standing to adopt. See In re: The Adoption of Baby Boy B, 487 So.2d 841, 842 (Miss.1986) (holding that "In view of [Mississippi Code Annotated Section 93-17-3(1)] we hold that once John, Hope's husband, withdrew his name from the petition to adopt Baby Boy B, that Hope, as sole petitioner and being legally married, was without standing under § 93-17-3 to continue in her efforts to adopt without her spouse joining in the petition and we affirm the lower court's holding.").
¶ 20. When G.G.S. married J.A.S., she automatically lost standing to pursue the adoption of J.D.S. unless and until J.A.S. joined the petition. J.A.S. argues in his brief that he was a de facto party to the adoption. Proof of that assertion is reflected *1138 in his undisputed testimony during the hearing to vacate B.P.P.'s adoption of J.D.S. At that hearing, J.A.S. testified that he participated in the hearing in 2000 on G.G.S.'s adoption petition.
¶ 21. J.A.S. testified that the chancellor who heard G.G.S.'s adoption petition, questioned him extensively about his role in the adoption. Specifically, the chancellor asked him about his job and his job security, about his feelings on raising J.D.S., whether he had any concerns about J.D.S. taking his last name following the adoption, and whether he took issue with the fact that J.D.S. was a bi-racial child. J.A.S. testified that he believed that the chancellor was asking for J.A.S.'s consent to the adoption of J.D.S. He also testified that, following that hearing, he believed he was J.D.S.'s adoptive father.
¶ 22. Based on that undisputed testimony, this Court agrees that J.A.S. appears to have been a de facto party to the adoption and that his consent to the adoption was an issue tried by the chancellor during G.G.S.'s final hearing on her petition to adopt J.D.S. Rule 15(b) of the Mississippi Rules of Civil Procedure provides in pertinent part as follows:
When issues not raised by the pleadings are tried by expressed or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. . . .
M.R.C.P. 15(b) (emphasis added). Had J.A.S. not been a party to the adoption at the time of the final hearing and ultimately determined by the chancellor to be an adoptive parent, the final adoption decree could not have been entered as a matter of law due to the standing requirements of Mississippi Code Annotated Section 93-17-3. The decree was entered, however, and J.D.S. was adopted. Moreover, while the adoption decree did not add J.A.S. as a party to the adoption, the decree does note that J.A.S. and G.G.S. are married and that J.D.S. would be taking J.A.S.'s last name.
3. Standing
¶ 23. In addition to holding that the adoption was void for failure to join J.A.S. as a necessary party under Mississippi Code Annotated Section 93-17-5(1), this Court finds that B.P.P.'s adoption of J.D.S. is void ab initio because she lacked standing under Mississippi Code Annotated Section 93-17-3 to pursue the adoption at the time that the petition was filed.
¶ 24. According to the testimony and the documents introduced at the hearing, G.G.S. and B.P.P. signed the petition consenting to the adoption in November 2003. In December 2003, B.P.P. got married. Several months later, in April 2004, B.P.P. filed her petition containing G.G.S.'s consent to the adoption. B.P.P.'s new husband did not join the petition. It is unclear from the record whether he attended or participated in the hearing on B.P.P.'s petition, but he is not mentioned in the final adoption decree, nor does the decree state that J.D.S. would assume the last name of B.P.P.'s husband. In fact, the final adoption decree ordered that J.D.S. would take B.P.P.'s maiden name as his last name. The record is clear, however, that B.P.P.'s husband did not participate in the hearing on the petition to vacate G.G.S.'s adoption of J.D.S. Because B.P.P.'s husband did not join the petition, B.P.P. did not have standing to adopt J.D.S. Accordingly, the resulting adoption is void ab initio.

*1139 CONCLUSION
¶ 25. Because J.A.S. was both a legal custodian and legal parent of J.D.S., J.A.S. was entitled to notice of B.P.P.'s attempts to adopt the child. Further, B.P.P.'s petition for adoption was void because she lacked standing as a married woman filing without her spouse to petition for the adoption. Accordingly, J.D.S. should be returned to his adoptive parents, G.G.S and J.A.S.
¶ 26. THE JUDGMENT OF THE CHANCERY COURT OF WEBSTER COUNTY IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] In the transcript of the hearing on the petition to vacate adoption that is the source of this appeal, G.G.S. testified that J.D.S.'s mother died in 2004. The record does not indicate why J.D.S.'s natural mother wished to place her son for adoption. Further, the record shows that J.D.S.'s father is unknown.